**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ROGUE WAVE SOFTWARE, INC.,                   :
                                             :
                    Plaintiff,               :
                                             :
          v.                                 :   Case No.: 1:16-cv-07772-VM
                                             :
BTI SYSTEMS INC. and JUNIPER NETWORKS, INC., :
                                             :
                    Defendants.              :
                                             :
                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### MEMORANDUM OF POINTS AND AUTHORITIES IN RESPONSE TO DECEMBER 15, 2017 SHOW CAUSE ORDER


KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, New York 10022
Telephone:  (212) 940-8800
Facsimile:  (212) 940-8776

*Attorneys for Defendants BTI Systems Inc.*
*and Juniper Networks, Inc.*

## TABLE OF CONTENTS

**Page**

FACTUAL BACKGROUND...................................................................................................1

ARGUMENT ......................................................................................................................9

I.     RULE 11 DOES NOT APPLY TO STATEMENTS MADE IN CONNECTION
WITH MOTIONS BROUGHT UNDER RULE 37. ...........................................9

II.    A VIOLATION OF RULE 11 CAN BE FOUND HERE ONLY IF IT IS
ESTABLISHED THAT COUNSEL KNOWINGLY LIED TO THE COURT
WHICH DID NOT HAPPEN. ...........................................................................10

A.    Defense Counsel Did Not Deliberately Mispresent The Existence Of Documents
Responsive To Rogue Wave's Discovery Request.............................................12

B.    Defense Counsel Did Not Deliberately Misrepresent The July 13, 2017
Teleconference....................................................................................................15

CONCLUSION..................................................................................................................20

On December 15, 2017, the Court *sua sponte* issued a show cause order, relating to statements made by counsel for Defendants, BTI Systems Inc. ("BTI") and Juniper Networks, Inc. ("Juniper"), in opposition to motions brought pursuant to Rule 37 by Plaintiff Rogue Wave Software, Inc. ("Rogue Wave") during a discovery dispute in this lawsuit.  (Dkt. No. 69).  The Court set an evidentiary hearing on the show cause order for January 9, 2018.  (*Id.*).  That evidentiary hearing was subsequently changed to January 19, 2018.  (Dkt. No. 82).  This memorandum is submitted per the Court's instruction at the conclusion of that evidentiary hearing.

## FACTUAL BACKGROUND

This lawsuit concerns a computer software program commonly referred to as "JTGO." (Complaint, ¶ 1) (Dkt. No. 1).  JTGO was originally developed by non-party ILOG, S.A. ("ILOG") (*Id.* at ¶ 9).  In early 2009, non-party International Business Machines Corporation ("IBM") acquired ILOG and its JTGO program.  (*Id.*).  In June 2009, BTI entered into an agreement with ILOG pursuant to which BTI licensed JTGO for use with several of its own software products.  (*Id.* at ¶ 12).  BTI paid a total of $54,280 for a three-year license.  That license expired on June 30, 2012.  (*Id.* at ¶ 13).  BTI inadvertently failed to renew it.  In September 2014, Plaintiff Rogue Wave purchased JTGO from IBM.  (*Id.* at ¶ 14).

Juniper entered into a Definitive Agreement to acquire BTI in its entirety in January 2016.  (Declaration of Emily Chang ("Chang Decl."), ¶ 3) (Dkt. No. 43-2).  During the due diligence leading up to execution of the Definitive Agreement, BTI became aware that its license to use the JTGO software had lapsed.  (*Id.* at ¶ 4).  BTI immediately contacted Rogue Wave, reported the lapse and sought to renew the license.  (*Id.*).  Rogue Wave demanded $3,373,488 for renewal of the license, despite the fact that BTI had paid only $54,280 for the initial license.  In

February 2016, BTI stopped shipment of all products containing any JTGO code.  No BTI product released since then contained any JTGO code.  On or about April 1, 2016, Juniper purchased all outstanding shares of the stock of BTI.  (Chang Decl., ¶ 3) (Dkt. No. 43-2).  Rogue Wave filed this lawsuit against BTI and Juniper in August 2016, alleging infringement of the copyright for JTGO.  (Complaint, ¶¶ 23-66) (Dkt. No. 1).

In May 2017, a discovery dispute arose between the parties concerning the availability of sales records for BTI products that contained the JTGO code.  Because there were no hard copy sales records from the relevant time period – June 30, 2009 forward – Defendants extracted from the electronic database that maintained sales information all data that was called for in Plaintiff's discovery requests.  (Transcript of January 19, 2018 Evidentiary Hearing ("Hearing Transcript") at 5).[1]  This information was provided to Plaintiff in May 2017 in the form of a detailed spreadsheet (introduced into evidence at the January 19, 2018 hearing as Exhibit 2).  This comprehensive spreadsheet contained all the information Plaintiff sought for its damages calculations as demonstrated by the fact that Plaintiff's damages expert was able to use it to produce a damages report.  (Hearing Transcript at 10, 27).  Plaintiff, however, refused to believe that there were no hard copy sales documents and, by letter dated June 12, 2017, asked the Court, "pursuant to Rule 37," to compel Defendants to produce such documents.  (Dkt. No. 45 at 3-4).

After reviewing Rogue Wave's June 12, 2017 letter, counsel for Defendants, Mr. Ross and Ms. Garrett, on June 14, 2017, held a telephonic conference with Defendants' in-house counsel and his paralegal responsible for obtaining documents and information responsive to discovery.  (Hearing Transcript at 12-14).  A copy of Mr. Ross' contemporaneous notes of that telephone call was received into evidence as Exhibit 1 at the January 19, 2018 evidentiary

---

[1] The transcript of the January 19, 2018 evidentiary hearing is incorporated herein by reference.

hearing.[2]  In that call, counsel discussed each of the discovery disputes with their clients.  (*Id.* at 13).  During the discussion, Defendants advised counsel that BTI, during the period relevant to this lawsuit, had recorded accounting information in an electronic format.  (*Id.* at 14).  That system only stored the data relating to a transaction in electronic form which could be printed out in a spreadsheet.  (*Id.* at 5, 14).  ("All of the requests here relate to a time period in which only electronic recordkeeping was maintained, and there simply are no hard documents to give them.").  Counsel asked whether there were any hard copies of invoices or similar financial records.  (*Id.* at 13-14).  Defendants reported that, during the relevant period, no such records existed because all data was kept in electronic form.  (*Id.* at 14) (Mr. Ross asked:  "Are you sure there aren't any hard documents?  He said, no, there are no documents for this responsive period.").  As confirmed by Mr. Ross' notes, Defendants also reported that BTI had sent 359 boxes of documents to off-site storage in Fremont, California, but that those documents were "pre-2009"—prior to the discovery period sought by Rogue Wave—and, therefore, not responsive to any discovery request.  (*Id.* at 14 and Exhibit 1).

Relying on the information provided by Defendants, counsel filed a letter with the Court on June 16, 2017, opposing Plaintiff's Rule 37 motion.  (*Id.* at 6:15-16) ("I was reliably depending upon what my clients told me."); (*id.* at 14:16-20) ("based on this conversation . . . I wrote to your Honor that there are no hard copies of documents . . . .").  In that opposition, Defendants stated: "Defendants' accounting system no longer consists of a traditional paper system with journals, ledgers and books of account.  All accounting information is now

---

[2] Counsel does not believe that the information contained in these notes is privileged because the subject-matter has already been revealed in the course of this litigation.  However, out of an abundance of caution, counsel has obtained Defendants' consent to disclose these notes.

maintained in a complex computer database.  Thus, for example, purchase orders are completed on a computer running special accounting software, not on a paper form." (Dkt. No. 48).

A telephonic conference was held with the Court on July 13, 2017.[3]   During the teleconference, Mr. Ross repeated the statement that BTI did not keep "traditional books and ledgers of accounts and invoices and things of that sort."  (Dkt. No. 76) (July Teleconference Transcript at 4:21-5:1).  Rather, like "most companies nowadays," BTI "moved into electronic bookkeeping."  (*Id.*).  Counsel noted that Defendants provided Rogue Wave with a "comprehensive" spreadsheet generated by DAX that contained the relevant sales and revenue information for BTI's ProNX products.  (*Id.* at 5:5-14).  Mr. Ross also explained that no further production was possible because "[w]e're not able to simply let one of [Rogue Wave's] people sit down at our computer database and troll through it.  They would be unable to enter the sort of inquiries to produce what they want."  (*Id.* at 5:2-5).  When asked by the Court as to why counsel had not provided this electronically stored information pursuant to Rule 34 of the Federal Rules of Civil Procedure, Mr. Ross responded:  "I don't know how to do that.  These are not emails which is the normal protocol where you can put in search terms and custodians.  This is an active ongoing live computer system[.]"  (*Id.* at 7:8-14).  In response, the Court instructed counsel that the way to "respond fully and appropriately to the discovery demands made by plaintiff" was to organize a meeting between Defendants' computer science employees and Plaintiff's computer science experts to "figure out a way to enable the plaintiff to get information it needs to prosecute the action . . . ."  (*Id.* at 8:1-6).

---

[3] Counsel for Defendants were unaware that the telephonic conference was being recorded, and no statement to that effect was made during the call.  (Hearing Transcript at 33).  Defendants' counsel were not alone in their belief.  Rogue Wave's counsel likewise were unaware that the conference was being recorded.  (Affidavit of Mr. Kilroy, Dkt. No. 81-1).

Thus, as the transcript of this July 13, 2017 teleconference confirms, the Court issued two directives to the Defendants relating to the discovery dispute at issue.[4]  First, the Court stated: "So I think you need to respond fully to the discovery demands made by Plaintiff through the Interrogatories 2, 3, 6, 9, 11, 12 and the Document Requests 4, 5, 7, 11 and 15 . . . ." (Dkt. No. 76 at 6:24 - 7:2).[5]  Second, with respect to extracting electronic data, the Court stated: "your clients employ people who have the expertise and the plaintiff does also or the Plaintiff may engage someone with the requisite expertise in computer science who could speak with your client's computer science personnel and figure out a way for the information that your clients have to be communicated to the plaintiff to respond fully and appropriately to the discovery demands made by the plaintiff."  (*Id*. at 7:18-25).

As Ms. Garrett testified, Defendants "compl[ied] fully with everything the Court instructed."  (Hearing Transcript at 37).  On July 24, 2017 and August 31, 2017, Defendants served on Plaintiff supplemental responses to Interrogatory Nos. 2, 3, 6, 9, 11 and 22.  (*See* Exhibit 1 attached hereto).  On August 31, 2017, Defendants served on Plaintiff supplemental responses to Document Production Request Nos. 7, 11 and 15.  (*See* Exhibit 2 attached hereto).[6] This discovery supplementation was confirmed by Ms. Garrett at the evidentiary hearing. (Hearing Transcript at 31-32).  Thus, Defendants complied with the first directive of the Court given at the July 13, 2017 teleconference.

---

[4] The Court also ordered Defendants to submit a document for *in camera* review and set a schedule for briefing.  Neither of these other orders by the Court are at issue here.

[5] The Court stated, erroneously, "12" instead of "22."  (Dkt. No. 70 at 15 n.1).  Defendants understood at the time that the Court meant Interrogatory No. 22.

[6] Document Request Nos. 4 and 5 did not require supplementation because they had already been fully responded to by Defendants.  (*See* Exhibit 3 attached hereto).

Defendants' counsel also complied with the Court's second directive relating to discovery and arranged a meeting between Defendants' accounting and information technology personnel and Rogue Wave's consultants. Immediately after the teleconference with the Court, Mr. Ross emailed counsel for Plaintiffs to set up such a meeting of experts. (Dkt. No. 54-1; Hearing Transcript at 7). And, such a meeting did take place. (*Id.* at 7, 23). As a result of that meeting, Defendants asked an employee to run on the computer system the queries suggested by Plaintiff's expert. (*Id.* at 8). As described in letters dated August 8, 2017 and August 31, 2017 (Dkt. Nos. 54-3 and 54-5), however, the process for extracting the data sought by Plaintiff's expert was very time consuming and expensive and would only yield the exact same data already produced to Rogue Wave in the spreadsheet. (Hearing Transcript at 8-9).

While trying to explain this point in the August 31, 2017 letter, Ms. Garrett stated: "the underlying business records related to sales of ProNx products that contained JTGO prior to September 2016 are in paper form in an off-site storage facility (if they exist)." (Dkt. No. 54-5). Standing on a previously made objection under Rule 26(b)(1), Ms. Garrett noted that, "due to the extraordinary burden of retrieving such paper records and their limited relevance to the case, Defendants are unwilling to undertake such project [of sorting through the boxes to locate any potentially responsive material]." (*Id.*). But she expressly "welcome[d]" Plaintiff to "do so" at its time and expense, and represented that "the files will be made available to you for your inspection and copying." (*Id.*).

Over a month later, and without responding to Ms. Garrett's August 31, 2017 letter or further engaging with Defendants on how to extract the electronic data, on October 4, 2017, Rogue Wave filed a Motion for Sanctions pursuant to Rule 37. (Dkt. No. 54). As Mr. Ross testified, Defendants were "shocked" by the filing of Plaintiff's motion because Defendants

believed that the process of determining how to best extract the electronic data "was still underway." (Hearing Transcript at 9). Plaintiff's Rule 37 motion asserted that Defendants "ha[d] failed to produce any of the information ordered on this issue despite multiple follow-up requests by Rogue Wave." (Dkt. No. 54 at 5). Defendants reasonably understood Plaintiff's assertion to complain about a purported failure to produce non-existent hard-copy financial documents. Defendants believed this because they had in fact complied with the Court's directives from the July 13, 2017 teleconference. (*See supra* pp. 5-6). Defendants had supplemented the interrogatory responses and document requests at issue (*see* Exs. 1 and 2 appended hereto); Defendants had produced their Director of Finance for deposition to confirm that the only records of sales were maintained in electronic form; and Defendants had arranged and participated in a meeting of the parties' respective experts to discuss the process of extracting electronic data from the computer system. Thus, Defendants reasonably believed that Plaintiff was still insisting upon the production of hard-copy sales documents – documents that simply did not exist. (Hearing Transcript at 20:17 - 21:5).

Defendants filed an opposition to Plaintiff's Rule 37 motion. (Dkt. No. 57). In that opposition brief, Defendants argued that Plaintiff had mischaracterized the outcome of the July 13, 2017 teleconference (*i.e.*, Plaintiff had fashioned a "non-existent order"); that Defendants had proceeded in good faith following the teleconference by facilitating further discovery into BTI's DAX system; and that the previously provided spreadsheet was responsive to Rogue Wave's request and fully admissible. (Dkt. No. 57 at 1, 5-6, 8-10).

Rogue Wave's motion was ultimately granted. (Dkt. No. 70). At the same time, the Court *sua sponte* issued a show cause order pursuant to Rule 11(c)(3) directing counsel for Defendants to appear for an evidentiary hearing on January 9, 2018. (Dkt. No. 69). That

evidentiary hearing was subsequently moved to January 19, 2018.  (Dkt. No. 82).  In that show cause order, the Court specified five statements made during this discovery dispute which it required counsel for Defendants to show cause why they did not violate Rule 11.  Specifically, the Court identified:

- a statement by Mr. Ross that the information on which Defendants' spreadsheet was created existed in electronic form only and was derived from searches of the applicable databases;

- a statement by Ms. Garrett that Plaintiff had created "a non-existent order;"

- a statement by Ms. Garrett that the Court "did not direct specific action by either side" with regard to the discovery of BTI's sales and revenue records;

- a statement by Ms. Garrett that the Court "did not order specific remedial action at the July 13, 2017 conference;" and

- a statement by Ms. Garrett that "it is not true" that the Court "gave Defendants an oral demand to turn over specific documents during the July 13, 2017 teleconference."

(Dkt. No. 69 at 3-5).  As discussed in detail below, Rule 11 does not apply to discovery disputes. Moreover, even if Rule 11 was applicable, none of these statements that are the subject of the show cause order are lacking in evidentiary support such that they would violate Rule 11.[7]

---

[7] In the event the Court decides to move forward with sanctions, it should note that the Sixth Circuit and Seventh Circuit have held that a Magistrate Judge lacks authority to enter orders imposing Rule 11 sanctions; they may only make a recommendation to a District Judge.  *Alpern v. Lieb*, 38 F.3d 933, 936 (7th Cir. 1994); *Bennett v. General Caster Service of N. Gordon Co.*, 976 F.2d 995, 998 (6th Cir. 1992).  *See also Kiobel v. Milson*, 592 F.3d 78, 87 (2d Cir. 2010) (Cabranes, J., concurring).

**ARGUMENT**

I.    **RULE 11 DOES NOT APPLY TO STATEMENTS MADE IN CONNECTION WITH MOTIONS BROUGHT UNDER RULE 37.**

Rule 11(d) of the Federal Rules of Civil Procedure states:  "This rule does not apply to disclosures and discovery requests, responses, objections, and motions under Rules 26 through 37."  Fed. R. Civ. P. 11(d).  As the 1993 Advisory Committee Notes to Rule 11(d) explain:  "It is appropriate that Rules 26 through 37, which are specifically designed for the discovery process, govern such documents and conduct rather than the more general provisions of Rule 11."  The Second Circuit has held that imposition of Rule 11 sanctions in connection with a discovery dispute is beyond the authority of a district court and is clear error.  *Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.*, 222 F.2d 52, 57-58 (2d Cir. 2000).

Each of the statements that is the subject of the show cause order were made in connection with a motion brought under Rule 37.  Mr. Ross' statement that is the subject of the show cause order was made in an opposition to a letter from Plaintiff expressly seeking relief "pursuant to Rule 37."  (Dkt. No. 45 at 3-4).  The statement at issue was repeated in a July 13, 2017 telephonic conference held by the Court to address Plaintiff's Rule 37 motion.  (Dkt. No. 75 at 4-5).  All of the statements made by Ms. Garrett that are the subject of the show cause order were in Defendants' brief in opposition to Plaintiff's Motion for Sanctions brought "pursuant to Rule 37."  (Dkt. No. 54 at 1 and 8).  Because all of the statements were made in connection with motions brought under Rule 37, Rule 11 does not apply to them.  Fed. R. Civ. P. 11(d).

Courts have consistently recognized that Rule 11 sanctions cannot be imposed in connection with motions brought under Rule 37.  *E.g.*, *New York v. Solvent Chem Co., Inc.*, 210 F.R.D. 462, 473 (W.D.N.Y. 2002) ("Since Solvent's original motion was brought pursuant to Rule 26, and its motion to compel was brought pursuant to Rule 37, sanctions in the form of

attorneys' fees may not be awarded under Rule 11."). An instructive case that presented facts virtually identical to those presented here is *United States v. Ansby*, 2005 WL 2372167 (M.D. Fla. Sept. 27, 2005). In *Ansby*, the Plaintiff filed a motion for sanctions pursuant to Rule 37 relating to inadequate discovery responses. *Id.* at *1. Defendants filed a brief in opposition to that Rule 37 motion. *Id.* Plaintiff then filed a motion alleging that Defendants' attorney had violated Rule 11 by making misrepresentations in that opposition to the Rule 37 motion. *Id.* The district court denied the Rule 11 motion holding that sanctions for Rule 11 would be "improper" because the alleged violations of Rule 11 were made in connection with a Rule 37 motion. *Id.* That is the exact case here – each statement identified in the show cause order was made in opposition to a Rule 37 motion and it would therefore be improper to find a Rule 11 violation.

## II.   A VIOLATION OF RULE 11 CAN BE FOUND HERE ONLY IF IT IS ESTABLISHED THAT COUNSEL KNOWINGLY LIED TO THE COURT WHICH DID NOT HAPPEN.

It is improper to apply Rule 11 to a discovery dispute such as presented here. *See Baffa*, 222 F.2d at 57-58. If, however, this dispute was somehow viewed as wholly unrelated to discovery, the standard for finding a Rule 11 violation would be difficult to meet. "Courts may issue Rule 11 sanctions only in extraordinary circumstances." *E. Gluck Corp. v. Rothenhaus*, 252 F.R.D. 175, 178 (S.D.N.Y. 2008) (Marrero, J.). Indeed, the Second Circuit has held that any decision with respect to Rule 11 must be "made with restraint," *Stovey v. Cello Holdings, LLC*, 347 F.3d 370, 387 (2d Cir. 2003), and sanctions only "imposed with caution." *MacDraw, Inc. v. CIT Group Equip. Fin., Inc.*, 73 F.3d 1253, 1259 (2d Cir. 1996).

When a sanctions proceeding is initiated by a court *sua sponte* pursuant to Rule 11(c)(3), and for which no safe harbor provision is available, as is the case here, a violation of Rule 11 can only be found when an attorney has acted in subjective bad faith. *ATSI Commc'n, Inc. v. Shaar*

*Fund, Ltd*, 579 F.3d 143, 150-51 (2d Cir. 2009) ("Court-initiated Rule 11 sanctions should also require a finding of subjective bad faith."); *In re Pennie & Edmonds LLP*, 323 F.2d 86, 91-92 (2d Cir. 2003) (same); *S.E.C. v. Smith*, 798 F. Supp. 2d 412, 420-21 (N.D.N.Y 2011) ("Under Rule 11(c)(3), a court *sua sponte* may institute sanctions proceedings, for which no safe harbor is afforded but which requires a finding of subjective bad faith.").[8] "Subjective bad faith requires proof of deliberate fraud or wrongdoing." *S.E.C. v. Smith*, 798 F. Supp. 2d at 424.

Each of the statements that is the subject of this show cause order fall within Rule 11(b)(3) in that each is a factual representation. Rule 11(b)(3) mandates that each factual contention has evidentiary support. Sanctions may not be imposed for a violation of Rule 11(b)(3), however, "unless a particular allegation is utterly lacking in support." *O'Brien v. Alexander,* 101 F.3d 1479, 1489 (2d Cir. 1996). In other words, an attorney need not prove the truth of a factual contention. *Kiobel v. Millson*, 592 F.3d 78, 82 (2d Cir. 2010). "Courts typically look for statements which rise to the level of direct falsehoods before they find that sanctions are warranted pursuant to Rule 11(b)(3)." *Safe-Strap Co. v. Koala Corp.*, 270 F. Supp. 2d 407, 412 (S.D.N.Y. 2003).

In order to meet the foregoing standard, in effect, it must be established that counsel knowingly lied to the Court. As discussed in detail below, each statement at issue in the show cause order was an accurate representation made without any subjective bad faith intent to mislead the Court. Thus, although Rule 11 clearly is inapplicable to this discovery dispute, no violation of Rule 11 occurred.

---

[8] As the Second Circuit noted in *Pennie* when it established this subjective bad faith standard, the Advisory Committee's notes to the 1993 Amendments to Rule 11 state that show cause orders are "akin to a contempt of court" for which a showing of bad faith is required. *Pennie*, 323 F.2d at 90.

### A.   Defense Counsel Did Not Deliberately Mispresent The Existence Of Documents Responsive To Rogue Wave's Discovery Request.

The first matter identified in the Court's show cause order is the supposedly "[c]ontrary" representations made by Mr. Ross and Ms. Garrett regarding the existence of hard-copy business records documenting sales of BTI's ProNX products responsive to Rogue Wave's discovery requests. (Dkt. No. 69 at 3-4). To begin, Mr. Ross' representations to the Court regarding the lack of hard-copy documents responsive to the discovery requests, as well as the maintenance of accounting information only in electronic form, are true and therefore comport with Rule 11. Indeed, Mr. Ross expressly discussed this issue with Defendants in advance of making the representation and made the representation based on information provided by Defendants. (Hearing Transcript at 6, 12-16, 28-29). This is confirmed by his contemporaneous notes of that discussion. (Hearing Transcript, Ex. 1). Moreover, Defendants' Director of Finance, Ms. Shelly Gupta, also confirmed this in unequivocal terms during her deposition. (Hearing Transcript at 7:21-24) ("She testified there are no hard records. She testified that . . . the salesperson immediately enters it electronically into the electronic database."). As explained by Ms. Gupta, the DAX system used by BTI did not maintain documents associated with BTI sales. (Gupta Deposition., 66:21-25, 74:11-8, 98:17-21) (Dkt. 57-5). Rather, BTI personnel would input the sales data directly into DAX. (Id. at 71:6-9). The electronic data saved in the DAX system represents all of BTI's responsive accounting information. (*Id.* at 100:23-24).

Mr. Ross was entitled to rely upon Defendants' statements in making representations to the Court. *Calloway v. Marvel Entm't Grp.*, 854 F.2d 1452, 1470 (2d Cir. 1988), *rev'd in part on other grounds*, 493 U.S. 120 (1989). Thus, Mr. Ross' representation to the Court cannot have been made in subjective bad faith and was entirely reasonable because it was based on representations from the Defendants which they confirmed under oath in deposition.

Ms. Garrett's statement in her August 31, 2017 letter to opposing counsel is not to the contrary.[9]  Ms. Garrett intended merely to convey the information obtained from Defendants during the above-referenced June 14, 2017 telephone call.  (Hearing Transcript at 28-29).  Ms. Garrett intended to report that there were no accounting documents from the responsive time period, but there may be accounting documents from an earlier time period, which Defendants would make available to Plaintiff.  (*Id.*).  Although not responsive to Plaintiff's demand, if Plaintiff wished to review them, the documents would be made available.  To the extent the statement might be read otherwise, it is the result of inartful wording – not a bad faith attempt to mislead.  Indeed, at the evidentiary hearing, Ms. Garrett confirmed that Mr. Ross' statements to the Court were accurate.  (*Id.*).

It is telling that Ms. Garrett did not withhold these documents from Rogue Wave and even offered to produce them.  As she noted in her August 31, 2017 letter, "due to the extraordinary burden of retrieving such paper records and their limited relevance to the case, Defendants are unwilling to undertake such project, *but you are welcome to do so and the files will be made available to you for your inspection and copying*."  (Dkt. No. 54-5) (emphasis added).  Because these documents were non-responsive—but made available to Rogue Wave in any event—there was no harm or prejudice.  In fact, counsel's willingness to turn over non-responsive material to placate any concern by Rogue Wave speaks to the lack of motive to do wrong and a genuine, good-faith effort to meet all applicable discovery obligations.

Ultimately, while Ms. Garrett's statement was poorly worded, it is not sanctionable.  If anything, it was the source of confusion, which does not rise to the "extraordinary" level

---

[9] Because Ms. Garrett's statement was made in a letter to opposing counsel and not a pleading filed with the Court, it is not subject to Rule 11.  Plaintiff filed the letter with the Court as an exhibit to a motion.  (Dkt. No. 54-5).

required to be subject to Rule 11 sanction.  *See N.A.S. Import Corp. v. Chenson Enters., Inc.*, 968 F.2d 250, 254 (2d Cir. 1992) (inadvertent misrepresentation of a party's corporate status does not trigger Rule 11 sanction).  Rule 11 sanctions are reserved only for deliberate and purposeful misrepresentations to the Court.

The acts at issue here stand in sharp contrast to acts that this Court has found to be sanctionable in the past.  In *Luscier v. Risinger Brothers Transfer, Inc.*, No. 13-cv-8553, 2015 WL 5638063 (S.D.N.Y. Sept. 17, 2015), this Court sanctioned a lawyer for falsifying (and later recanting) an attorney affidavit claiming that he presented his client with a client affidavit, "discussed the contents" of affidavit on multiple occasions, and "inputted changes to the affidavit at [the client's] request."  *Id.* at *10.  In reality, the attorney drafted the client affidavit on his own without any client input, and subsequently falsified the client's signature on the document. *Id.* at *3.  He later filed the false attorney affidavit in an effort to cover up his misdeed after his client disavowed knowledge of the client affidavit during cross examination at trial.  *Id.* at *2. This Court sanctioned the attorney because "[t]here is no question that [he] knew that the factual statements made to the Court [in the attorney affidavit] were false" and "made in bad faith."  *Id.* at * 10.

Another clear example of sanction-worthy misconduct is *S.E.C. v. Smith*, 798 F. Supp. 2d 412 (N.D.N.Y. 2011), *aff'd in relevant part*, 710 F.3d 87 (2d Cir. 2013).  There, the Court sanctioned a party for "overwhelming evidence of deliberate concealment and misrepresentation" of a trust account that should have been subject to an asset freeze.  *Id.* at 424. The party represented in court filings that the trust was set up for the exclusive benefit of her children and that she lacked any present or future interest in the account, thus persuading the court to unfreeze the account.  *Id.* at 418, 423.  Within days of the court unfreezing the account,

the trust expended nearly a $1 million (about a quarter of its value), "most to benefit of [the sanctioned party]." *Id.* at 424. The court concluded that the party "acted with subjective bad faith" through a pattern of conduct that "refute[d]" any "assertion of forgetfulness" or other innocent explanation. *Id.* at 425-26.

The representations at issue here pale in comparison to the flagrant misconduct sanctioned in *Luscier* and *Smith*. The behavior in those cases smacked of a willful and calculated intent to deceive the court. In contrast, the statements made by Mr. Ross here are clearly true. Indeed, there is zero evidence to the contrary. Mr. Ross has testified to their accuracy and his testimony is corroborated by his contemporaneous notes. Ms. Garrett has testified that the statements were true. And, Defendants' Director of Finance has testified that the statements were accurate. This evidentiary record establishes beyond dispute that Mr. Ross' statements fully comport with Rule 11.

## B. Defense Counsel Did Not Deliberately Misrepresent The July 13, 2017 Teleconference.

The show cause order also suggested that counsel misrepresented the directions given at the July 13, 2017 teleconference relating to Rogue Wave's Rule 37 motion. It is critical to note at the outset that neither party knew that the July 13, 2017 teleconference was being transcribed. Counsel to Defendants did not understand that the July 13, 2017 teleconference was being transcribed/recorded. (Hearing Transcript at 33-34). Indeed, this was a reasonable understanding as demonstrated by the fact that counsel for Plaintiff also did not understand that the hearing was being transcribed/recorded. (Dkt. No. 81-1). Moreover, defense counsel's past experience with telephonic court hearings were that, at the outset, an announcement was made that the hearing was being transcribed/recorded (if it was). (Hearing Transcript at 34). Based upon this misunderstanding, counsel represented in Defendants' opposition to Rogue Wave's

Rule 37 motion that "[b]oth parties are operating upon their respective recollections of the proceeding." (Dkt. No. 57 at 8). There was no subjective bad faith on the part of counsel and this misunderstanding does not arise to the sort of "extraordinary" conduct that violates Rule 11.

Moreover, counsel did not intend to label any order given by this Court during the July 13 teleconference as "non-existent." (*See* Dkt. No. 69 at 5). That comment was a response to what counsel believed to be a grossly inaccurate characterization by Rogue Wave of what took place during the teleconference. (Hearing Transcript at 20-21). Rogue Wave argued that the Court had ordered Defendants to produce "underlying sales and revenue information," (Dkt. No. 54 at 2)—which, in the context of the ongoing dispute, Defendants understood to mean hard-copy sales records. (Hearing Transcript at 20-21). Because there are no such hard copies of sales records, Defendants labeled that representation by Plaintiff as a "non-existent order." (*Id.*). Defendants never intended to suggest that the Court's actual order was "non-existent." (*Id.* at 20).[10]

As Ms. Garrett testified:

> "so we didn't intend to mean that the Court hadn't issued any instructions or orders during the July 13th teleconference. That was not our intention at all. That was a response to our perception of Plaintiff's Rule 37 motion for sanctions in terms of exaggerating what had been instructed at the July 13th teleconference. We understood that plaintiff was complaining that we had not produced any financial sales and revenue records, and in the context of the discussion we'd been having, we understood that they were complaining that we hadn't produced any hard copy documents, which as Mr. Ross just explained, are nonexistent. They don't exist. So we were – perhaps, it was not the best wording or the best phrasing, but what we were trying to convey was that the order for those documents, they were nonexistent documents."

---

[10] In fact, it is telling that defense counsel represented, "to the extent this Court did give guidance regarding the discovery of sales and revenue data, defendants took all reasonable steps to comply." (Dkt. No. 57 at 9) (thus, acknowledging the Court's order).

(Hearing Transcript at 20:17 - 21:5).

As for the remaining comments identified in the Court's show cause order regarding the nature of the Court's directives, counsel did not intend to mispresent what had taken place at the July 13, 2017 teleconference.   First, Ms. Garrett's statement that the Court did not order Defendants to produce any "specific document" is literally true.   As the transcript of the July 13, 2017 telephonic conference confirms, no "specific" document was identified to be produced. (Dkt. No. 76).   Indeed, as Ms. Garrett testified, it would have been impossible to identify any "specific" documents and order them produced because no such documents existed.   (Hearing Transcript at 24:10-12) ("Q. And what was the problem with producing specific documents in this case?  A. Those documents don't exist.").

As Ms. Garrett testified:

> Q.   And did you think the Court had directed your client to produce any specific documents?
> A.   No.  We didn't understand any – a direction for any specific documents to be produced.
> . . .
> Q.   . . . what you were referring to was specific documents which the Court didn't order because he couldn't have ordered because they don't exist?
> A.   Exactly, yes.

(Hearing Transcript at 23:13-16; 26:11-20).

The other two statements subject to the show cause order – that the Court did not "order specific remedial action" and did not "direct specific action by either side" – are related.   In this regard, context is important to understanding those statements.   When counsel represented that the court "did not direct specific action by either side" with regard to the discovery of BTI's sales and revenue records, they did so in the reasonable belief that, during the July 13, 2017 teleconference, the Court had directed the parties to work jointly to reach a solution as to how to

extract data from the DAX system.  (Hearing Transcript at 22:9-25) ("we understood the instruction to be to work together jointly with plaintiff and their experts or outside forensic experts to come up with a strategy and a plan as to how to mine the DAX system").

In that sense, counsel believed that the Court "did not direct specific action by either side."  (*Id.*)  ("there wasn't . . . any specific action we were required to take in terms of a production because all of these would be the result of and subject to the conference call between the parties' experts.").  This belief was the product of the final exchange between Mr. Ross and the Court in the July 13, 2017 teleconference regarding Defendants' ability to provide electronically stored data.  Mr. Ross represented that he "d[id not] know how" to produce information from BTI's accounting database according to a standard ESI protocol because DAX "is an active ongoing live computer system."  (Dkt. No. 76 at 7:13-14).  To this, the Court responded that it was up to the parties and their experts to "figure out a way to enable the plaintiff to get information it needs to prosecute the action."  (*Id.* at 8:1-6).  Based upon that exchange, defense counsel reasonably believed that the "*specific* action" which Defendants would take was left open, pending conferral among the parties' employees and experts as to what precisely could be extracted from DAX.  (Hearing Transcript at 23:17 - 24:1-5).

Counsel's good-faith understanding of the Court's directive is evidenced by their conduct after the July 13, 2017 teleconference.  Immediately following the conference, counsel for Defendants emailed counsel for Plaintiff "welcom[ing] your proposal or the proposal of your expert on how to extract [the sales information you seek], such that it will satisfy you."  (Dkt. No 54-1 at 1; Hearing Transcript at 7:11-17).  At the end of July 2017, Plaintiff deposed Ms. Shelly Gupta.  Ms. Gupta answered questions about BTI's accounting system and the manner in which the data contained in BTI's accounting spreadsheet was collected.  (*Id.* at 7:18-25 - 8:1-3).

Shortly thereafter, IT personnel from Juniper conferred with Rogue Wave's e-discovery vendor to discuss BTI's accounting systems, and what information could (and could not) possibly be extracted from these systems. (Hearing Transcript at 23:9-12). These discussions confirmed what Ms. Gupta had already told Plaintiff: BTI's accounting system did not contain any underlying sales records. Thus, counsel believed in good faith that they were following the Court's direction from the July 13, 2017 telephonic conference. (Hearing Transcript at 14-15; 35-37).

Counsel's understanding of the Court's directions during the July 13, 2017 teleconference likewise explains its representations that the Court "did not order specific remedial action." (Dkt. No. 69 at 5). Counsel reasonably believed that the specifics of any "remedial action" would be dictated by the outcome of the meeting of the parties' experts relating to DAX. (Hearing Transcript at 23:17-25, 24:1-5) ("because of the word 'specific,' we understood the Court's direction at the conference again to just be, work together, collaborate, have the experts speak, and the remedial action to be taken would be the result of what was discussed during the call."). This belief was reasonable because it was not known at the time precisely what kinds of data, if any, could be extracted from DAX.

Given the foregoing context, these statements by defense counsel are not "utterly lacking in support" as would be required to violate Rule 11(b)(3). *See O'Brien*, 101 F.3d at 1489. There certainly is no subjective bad faith on the part of defense counsel because, as Ms. Garrett testified, she believed them to be true. (Hearing Transcript at 20-26). Defense counsel reasonably understood the Court to direct the parties to convene their respective experts to discuss what could be obtained from DAX before actual production of data from DAX took place. Defense counsel believed in good faith this was a first step that had to be undertaken

before moving to a decision as to what specific remedial action could be taken through production of electronic data.  Thus, there was no knowing and deliberate falsehood that violated Rule 11.

## CONCLUSION

For the foregoing reasons, counsel respectfully asks that the Court's December 15, 2017 Show Cause Order be discharged without any sanction.

Respectfully submitted,

KATTEN MUCHIN ROSENMAN LLP

Dated: January 26, 2018

   /s/ Terence P. Ross
Jessica M. Garrett
575 Madison Avenue
New York, New York 10022
Phone: (212) 940-8800
Facsimile: (212) 940-8776
jessica.garrett@kattenlaw.com

Terence P. Ross
2900 K Street NW
North Tower – Suite 200
Washington, DC 20007-5118
Phone: (202) 625-3676
Facsimile: (202) 298-7570
terence.ross@kattenlaw.com

*Attorneys for Defendants BTI Systems Inc. and Juniper Networks, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on January 26, 2018, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to

the following:

Mr. James D. Kilroy
Snell & Wilmer LLP
1200 Seventeenth Street, Suite 1900
Denver, Colorado 80202
jkilroy@swlaw.com

Ms. Ellie Lockwood
Snell & Wilmer LLP
1200 Seventeenth Street, Suite 1900
Denver, Colorado 80202
elockwood@swlaw.com

Mr. Kaleb McNeely
Dorsey & Whitney LLP
51 West 52nd Street
New York, New York  10019-6119
mcneely.kaleb@dorsey.com

Mr. Daniel Goldberger
Dorsey & Whitney LLP
51 West 52nd Street
New York, New York  10019-6119
goldberger.dan@dorsey.com

                                    /s/Terence P. Ross
                                    Terence P. Ross